**Carroll A. NOVICKI, Plaintiff,**

v.

**Janet C. COOK, et al., Defendants.**

**Civ. A. No. 90–0285 (HHG).**

United States District Court, District of Columbia.

July 5, 1990.

W. Jay DeVecchio, Clifton S. Elgarten, Crowell & Moring, Washington, D.C., for plaintiff; (Joan H. Moosally, Bryan K. Pollard, of counsel).

Jay B. Stephens, U.S. Atty., John D. Bates, Molly D. Current, Asst. U.S. Attys., Washington, D.C., for defendants; (Donald Suda, Office of the Gen. Counsel, Defense Logistics Agency, of counsel).

## MEMORANDUM

HAROLD H. GREENE, District Judge.

Plaintiff, the former president and chief executive officer of Dale Electronics, Inc. (Dale), brought this action to enjoin his debarment from government contracting. The Defense Logistics Agency (DLA)[1] ordered such debarment in August 1989 for a period of three years, upon its conclusion that plaintiff had reason to know that his company was defrauding the Department of Defense by, among other things, submitting fabricated test results and false quality control reports.[2] Before the Court are cross-motions for summary judgment presenting the single issue whether the agency's decision was arbitrary or capricious.

### I

From 1981 to 1989, Novicki was president of Dale, a manufacturer of wirebound and metal film resistors and other electronic components used in military weapons and navigation systems. Dale also supplied fixed film resistors to the military, the contracts for such resistors constituting a significant part of the company's business.[3]

Because the resistors were used in nuclear missiles, advanced fighter aircraft, Trident submarines, and other sensitive weapons systems, the contract required that they be proved to be extremely reliable, and the Department of Defense paid a premium price for this reliability. Under the contract, Dale was required to perform regular quality control tests and to report the results of these tests to the Department. No more than one failure per 53.2 million hours of life testing was permitted. Dale was also required to inform the Department whenever its customers reported field failures of resistors. Failure to report test or field failures could have cost the company the contract.

From 1982 to 1986, Dale executives intentionally and systematically underreported the number of instances in which resistors failed. In all, the company made forty-two false statements by deleting from reports submitted to the Defense Electronics Agency fifteen instances of resistor failure in quality control tests. The director of Dale's test laboratory subsequently told investigators that he had been pressured by three senior Dale executives not to report test failures and had been warned that his department would be blamed for any failures that were reported.[4]

During the same period, Dale received thirty-five reports from customers of 1,350 instances of resistor failure. As indicated, under the contract, Dale was required to report these failures too, to the Department of Defense. However, Dale executives again made a decision not to do so. Instead, when customers told Dale of the failures, the company blamed them on the customers' inept handling. Dale personnel also knew, but failed to report, that between twenty and twenty-seven percent of the Dale resistors in the MX nuclear missile and certain other critical weapons systems had failed. Losses from resistor failures now total $2.5 million, and failures in the future are expected to result in the destruction of two orbiting satellites at a cost of $176 million.

For purposes of this case, it is undisputed that four of Dale's executives, including the company's vice president, participated in, knew of, or had reason to know of the scheme, and that all of them have been debarred. The Defense Department further found that Novicki had reason to know of the fraud, and it debarred him under Federal Acquisition Regulation (FAR) 9.406–5(b), which authorizes such action of

---

1. DLA is a combat support agency within the Department of Defense.

2. Plaintiff received full notice as well as ample opportunity to contest the debarment.

3. Dale estimated that the loss of the contract would result in the loss of close to $4 million within four to six months and the layoff of some one hundred employees.

4. The executives were Sam Burrell, quality control manager for Dale's Norfolk, Nebraska plant, Albert Kruse, production manager at the plant, and Glenn Carter, director of Dale's quality assurance program.

executives who had "reason to know" of the misconduct involving other employees of a company.[5] Novicki instituted the instant action challenging the DLA decision to debar him and the underlying conclusion that he had reason to know of the fraud.

## II

■ Before discussing whether the evidence supports the DLA's conclusion, it is useful to set out basic principles. To debar plaintiff, the agency was required to demonstrate by a preponderance of the evidence that he had reason to know of the fraud. 48 C.F.R. 9.403. The agency's decision to that effect is subject to judicial review under an arbitrary and capricious standard. 5 U.S.C. § 706(2)(A). *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Robinson v. Cheney,* 876 F.2d 152, 155 (D.C.Cir.1989). The arbitrary and capricious standard is highly deferential in these circumstances, and it presumes the agency's action to be valid. *Overton Park,* 401 U.S. at 416, 419, 91 S.Ct. at 825; *Motor Vehicle Manufacturers Association v. State Farm Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1985).

While the concept is not defined in the regulations, "reason to know" is generally understood to mean that a reasonable person in the same position as the actor would infer the facts at issue from facts already known to him, or that he would conclude that there was such a substantial chance of their existence that he would predicate his actions upon an assumption of their possible existence. Restatement (Second) of Agency § 9.

The issue before the agency, then, and now before the Court, is whether Novicki had information from which a reasonable person would have inferred what was occurring at the company with respect to the resistors. The DLA's conclusion that plaintiff had reason to know of the fraud his

company was perpetrating on the government is plainly supported by the evidence.

The problem with faulty resistors and with complaints from dissatisfied customers extended over a number of years. During that period, there were 1,350 performance failures and thirty-five separate complaints from numerous customers. Nor were the failures and complaints associated with a routine product of minor importance to the company such that the company's president would have had no reason to know of their occurrence. To the contrary, the contract at issue was of cardinal importance to Dale, and any failure was of great significance in view of the premium price that was paid to Dale for perfection and the highly sensitive use that was to be made of the resistors. Moreover, Novicki's direct and his second-tier subordinates were deeply implicated in the fraud. In view of these facts, Novicki conceded, as he could hardly avoid doing, that at least as of 1986 he was "generally aware" of customer complaints. Novicki Aff. ¶ 14. Finally, the fact that such a problem existed but that DLA never inquired about it, let alone to investigate it, constituted a basis for an inference that the agency was not receiving the data to which it was entitled.

Plaintiff's explanation—that he asked his subordinates about the problem and that they informed him that the failures resulted from the customers' improper soldering techniques—must have sounded entirely improbable even to him, in view of the number of customers involved, almost all of which were large manufacturers skilled in assembling high-tech components, and in view of the assumption underlying the alleged explanation that all of these customers made virtually identical mistakes on numerous occasions.

Plaintiff of course had the duty to keep informed of corporate activities and to exercise reasonable control and supervision over his subordinate officers, *United States v. Byrum,* 408 U.S. 125, 92 S.Ct. 2382, 33 L.Ed.2d 238 (1972); *Joy v. North,*

---

5. The agency also concluded that Dale's misconduct was so serious that it affected Novicki's present responsibility as a government contrac-

tor. *See* 48 C.F.R. 9.402(a); *Caiola v. Carroll,* 851 F.2d 395, 398 (D.C.Cir.1988).

692 F.2d 880 (2d Cir.1983), as well as the duty to seek out and remedy violations wherever they might occur. *United States v. Park*, 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975). Clearly, his claimed acceptance of the improbable, if not incredible, explanations that were allegedly furnished to him was inconsistent with these duties. On the basis of these general factors alone, the agency's determination that plaintiff had reason to know of the fraudulent activities cannot be regarded as arbitrary or capricious.

There is yet an additional factor of some importance. In April 1987, Department of Defense investigators executed search warrants at Dale, seizing a quantity of documents relating to testing and production. The execution of a search warrant is a traumatic event in the life of any corporation, yet Novicki's response was limited, to say the least. In addition to consulting Dale's general counsel on an undisclosed subject, he assigned two executives (both of whom were later debarred for their parts in the fraud) to ascertain whether any problems existed. The government asserts—and Novicki does not contest—that these executives took more than a year to come back with an answer and then informed him that nothing was wrong at Dale. Novicki took no further action then or later when the DLA concluded that the Dale resistors were substandard.[6] Here again, the agency was justified in concluding that plaintiff's tepid response to the search warrants supported the conclusion that he had reason to know of the wrongdoing.

### III

Plaintiff offers a number of arguments why notwithstanding these factors he should not be debarred, and the Court will address them in turn.

■First, he maintains that he lacked contemporaneous knowledge or reason to know of the misconduct. The record, how-

ever, belies this claim. Novicki acknowledges that he learned of the complaints "by the fall of 1986." On October 26, 1986, the company prepared a false report indicating that no quality control tests had been performed during the six months beginning May 1982. In fact, the tests had been performed and three resistors had failed. Similarly, a second batch of resistor failures in October 1986 was likewise not reported.

In any event, plaintiff cites no authority for the proposition that FAR 9.406–5(b) requires contemporaneous knowledge or reason to know, and the Court can find none. Such an interpretation would make no sense. The Department of Defense was not precluded from debarring an executive who knew or had reason to know of the misconduct after it had occurred, but before it was uncovered by the government, and who failed to take remedial action of any sort. Such an interpretation would undermine the express policy of the regulations of ensuring that the government will do business only with responsible individuals. FAR 9.402(a). *See* note 5, *supra.*

■ On a related basis, plaintiff argues that at the time the debarment process was initiated, the agency lacked sufficient reasons for concluding that he had a reason to know of Dale's fraud. Reply at 10 n. 4. In the first place, probable cause is not a prerequisite to the initiation of a civil proceeding. Second, DLA had an abundance of evidence of his reason to know by the time it initiated the proceeding. The most that can be said is that, during the debarment process, the agency refined and to some extent altered the reasoning underlying its conclusion that plaintiff had a reason to know of the fraud. One purpose of the proceedings was to give the agency an opportunity to do just that.

■ Plaintiff next argues that the DLA decision was arbitrary and capricious because he was not given the same treatment as Dale Electronics, which was not de-

---

**6.** By contrast, when Vishay Intertechnology acquired Dale Electronics in 1988, it took affirmative steps to root out the fraud and prevent its reoccurrence. Those steps included an internal audit and investigation, and organizational restructuring designed to prevent reoccurrences, and an offer to make restitution for possibly defective parts.

 

barred. The obvious answer is that he was treated differently because he and the company are in different positions. In July 1988, Dale was acquired by Vishay Intertechnology, and the new owner made drastic changes in the management and operation of the company to ensure DLA that it could be a responsible contractor. One of the most significant changes was that Vishay purged Novicki and all of the remaining participants in the fraud.

Plaintiff further states, and he repeats over and over, that he was debarred solely because of his status as president and CEO of Dale. However, even the most cursory reading of the agency's decision demonstrates that this is entirely false. The agency's memorandum of proposed debarment lays out in considerable detail the evidence supporting its conclusion, including plaintiff's knowledge of the complaints by customers of resistor failures. In short, the claim that plaintiff was debarred only because of his status or position is not only factually erroneous but it misses the point of the agency action; his position was of course relevant to that action and legitimately so, for one in his position, knowing what he knew, was on notice to inquire further and had a duty to take action.

Finally, plaintiff contends that the "reason to know" standard cannot properly be applied to him on the basis that he failed to prevent misconduct by others. But that contention rests on the implicit assumption that there cannot be a violation unless there is proof that the particular individual has actual knowledge of and directly participates in the misconduct—an assumption that would effectively read the "reason to know" standard out of the regulation. This case is a textbook example of why the regulation properly covers more than actual knowledge: plaintiff's professed reliance on implausible and clearly false assurances by close subordinates permitted the agency to debar him on the basis that he had reason to know of the fraudulent conduct.

The agency's decision that plaintiff had reason to know of the fraud perpetrated by Dale employees was not arbitrary or capricious or otherwise not in accordance with the law. On the contrary, the agency's conclusion is well supported by the evidence in the record, and the debarment will therefore be sustained.

### ORDER

Upon consideration of the motions and memoranda, as well as of counsels' oral argument, and the entire record herein, it is this 5th day of July, 1990, in accordance with the Memorandum issued contemporaneously herewith

ORDERED that plaintiff's motion for summary judgment be and it is hereby denied; and it is further

ORDERED that defendants' motion for summary judgment be and it is hereby granted; and it is further

ORDERED that plaintiff's motion for a preliminary injunction be and it is hereby denied; and it is further

ORDERED that the action be and it is hereby dismissed.