**Carroll A. NOVICKI, Appellant,**

v.

**Janet C. COOK, Special Assistant for Contracting Integrity Defense Logistics Agency, in her official capacity.**

**No. 90–5206.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 11, 1991.

Decided Oct. 15, 1991.

Clifton S. Elgarten, with whom W. Jay DeVecchio and Joan H. Moosally, Washington, D.C., were on the brief, for appellant.

Michael L. Martinez, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee. Molly D. Current, Asst. U.S. Atty., Washington, D.C., also entered an appearance, for appellee.

Before RUTH BADER GINSBURG, SILBERMAN and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

This case concerns a decision of the Defense Logistics Agency (DLA), a combat support agency within the Department of Defense, to debar Carroll A. Novicki, the former president and chief executive officer of Dale Electronics, Inc., from government contracting on the ground that he had "reason to know" of Dale's misconduct. Novicki contends that the agency failed to apply the "reason to know" standard, debarring him instead on the basis of his mere status at Dale. The district court rejected this argument, concluding that the agency properly applied the "reason to know" standard, and Novicki appeals. We think that the agency's decision is ambiguous. It would appear that the agency applied an incorrect legal standard, but assuming *arguendo* that it did use "reason to know," we do not think the record adequately supports the agency's decision. Novicki's debarment therefore must be vacated.

## I.

Carroll A. Novicki was, from 1981 to 1989, the president and chief executive officer of Dale, a major manufacturer of electronic components. Dale manufactured fixed film resistors used in sophisticated military weapons and navigation systems, including the MX missile and the Global Positioning Satellite System. As president and chief executive officer, Novicki had ultimate authority over the company's financial affairs and strategic business plan. He also oversaw its five operating product divisions and six control and support divisions. Direct responsibility for manufacturing operations was placed in the execu-

tive vice president for resistors and various division directors and product managers.

From 1982 to 1986, Dale was listed on Qualified Products Lists (QPL) as a source for two particular military specifications of fixed resistors. QPLs are administered by the Defense Electronics Supply Center (DESC), a field activity of DLA responsible for acquiring electronic components for the military services. Listing on a QPL indicates that a product has been examined and tested and that it satisfies all governmental requirements. *See* 48 C.F.R. § 9.201. In order to be retained on the QPLs with the highest possible reliability rating of "S," which signified that the resistors failed no more than once in 53.2 million hours of life testing, Dale was required by the applicable military specifications continually to test its resistors and to report all test failures, as well as "field failures" reported by customers, to DESC.

In September 1986, DESC began receiving complaints from Dale customers about the reliability of the company's QPL resistors. DESC then conducted two audits of Dale in October and November 1986. The audits uncovered deficiencies to which Dale responded with thirty-one corrective actions approved by DESC. Because the audits revealed unreported customer complaints, DESC referred the matter to the Defense Criminal Investigative Service (DCIS) for further investigation. In April 1987, DCIS began an extensive two-year investigation with the execution of two search warrants at Dale facilities, during which records pertaining to the testing and production of QPL resistors were seized. At about the same time, DESC initiated proceedings to reduce Dale's "S" rating on the QPL resistors.

Relying on DCIS's findings, DESC recommended that DLA debar Dale, Novicki, and five of Novicki's subordinates from government contracting. According to DESC's report, between 1982 and 1986 Dale made numerous false statements to DESC regarding unreported test and field failures. Although the investigation revealed "no direct evidence linking [Novicki] to the fraudulent scheme," DESC recommended Novicki's debarment on the ground that he, "as President and the person to whom ultimately everyone reported, was in a position to know, or should know, that this type of activity was going on at Dale."

The Federal Acquisition Regulation, jointly issued by the Department of Defense, the General Services Administration, and the National Aeronautics and Space Administration, prescribes the policies and procedures governing agency debarment of contractors. *See* 48 C.F.R. § 9.400(a)(1). Under the regulation, a contractor may be debarred for a number of reasons, including fraud in the performance of a public contract or subcontract, *see id.* § 9.406–2(a)(1)(iii), and commission of any offense "indicating a lack of business integrity or business honesty that seriously and directly affects the present responsibility of a Government contractor or subcontractor," *id.* § 9.406–2(a)(4). A contracting company is held strictly accountable for the misconduct of its employee "when the conduct occurred in connection with the individual's performance of duties for or on behalf of the contractor," *id.* § 9.406–5(a), but an individual employee or officer can only be debarred if he or she "participated in, knew of, or had reason to know of the contractor's conduct." *Id.* § 9.406–5(b).

Although DLA did not initiate proceedings to debar Dale, which had been under new ownership since July 1988,[1] in August 1989 DLA Special Assistant for Contracting Integrity Janet C. Cook (Special Assistant) notified Novicki and the five other Dale employees that the agency had initiated proceedings to debar them from government contracting. Novicki, in response, submitted an affidavit in which he asserted that he had not been apprised of any misconduct such as that alleged, nor of any facts that would have led him to suspect the existence of such misconduct. The

---

1. The agency and the new parent company entered into an administrative agreement whereby DLA agreed not to debar Dale because significant changes in management, policies, and practices had occurred, and because Dale agreed to permit DESC to monitor its manufacturing process.

affidavit stated only that he "was made generally aware" of customer complaints about the QPL resistors "[b]y the Fall of 1986" and that he also knew of the April 1987 searches. Novicki explained that he suspected no misconduct because his subordinates had assured him that the customer complaints did not involve field failures that needed to be reported to DLA and that the documents seized in the searches did not indicate that any wrongdoing had occurred.

The Special Assistant subsequently issued a memorandum of decision debarring Novicki for the maximum period of three years on the ground that Novicki had "reason to know" of Dale's misconduct. She based that determination on Novicki's "status at Dale," which "put him in a position to discover the misconduct, report it to the Government, and take corrective action." Novicki challenged his debarment in the district court, arguing in part that the Special Assistant misconstrued the "reason to know" standard. The district court affirmed the agency's decision, and Novicki appeals.

## II.

[1, 2] We do not defer to a district court's review of an agency adjudication any more than the Supreme Court defers to a court of appeals' review of such a decision. *See Costello v. Agency for Int'l Dev.*, 843 F.2d 540, 543 n. 5 (D.C.Cir.1988). That is so because the agency itself is typically owed deference with respect to its fact-finding, *see NLRB v. Brown*, 380 U.S. 278, 292, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965), its application of law to facts, *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), and its interpretation of the governing statute or regulation, *see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Since def-

erence is owed, according to doctrines of administrative law, to the agency, it is anomalous (if the agency and district court disagree analytically impossible) to defer also to another court's review of the agency's action. In this case, however, we do not defer to the agency either—at least with respect to its interpretation of the regulation—because that regulation was the joint product of, and must be interpreted by, three different agencies. *See Caiola v. Carroll*, 851 F.2d 395, 399 (D.C.Cir. 1988).

Section 9.406–5(b) does not define "reason to know." At common law, a person has reason to know a fact if he

has information from which a person of ordinary intelligence, or of the superior intelligence which such person may have, would infer that the fact in question exists or that there is such a substantial chance of its existence that, if exercising reasonable care with reference to the matter in question, his action would be predicated upon the assumption of its possible existence.

*RESTATEMENT (SECOND) OF AGENCY* § 9 cmt. d (1958); *see also RESTATEMENT (SECOND) OF TORTS* § 12(1) (1965). The *Restatement* definition of "reason to know" imposes no duty of inquiry; it merely requires that a person draw reasonable inferences from information already known to him. Counsel for both parties (as well as the district court, *see Novicki v. Cook*, 743 F.Supp. 11, 13 (D.D.C.1990)) defined "reason to know" under Section 9.406–5(b) according to the *Restatement* definition.[2]

Appellant argues, however, that the Special Assistant misconstrued the "reason to know" standard and instead improperly imputed Dale's misconduct to him under either a strict liability or a "should have known" standard. So it would appear. The Special Assistant, defining "reason to know" as "related to status rather than knowledge," characterized the relevant inquiry as whether Novicki was "in such a

2. Strictly speaking, we realize that the agency is not bound by the position of counsel. But it seems unlikely to us that the drafters of section 9.406–5(b) intended any meaning other than the accepted common law definition of "reason to know."

responsible relationship to the misconduct as to have had the power to prevent the misconduct by exercising the level of care and exertion that society would reasonably expect from someone in [his] position." She concluded that, by virtue of his status at Dale, Novicki did have both "a responsible relationship to the misconduct" and the "power to prevent" it. This language parallels that of *United States v. Park*, 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975), in which the Supreme Court upheld the imposition of strict liability on a corporate officer who had a "responsible relationship" to corporate wrongdoing under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 331(k). *See Park*, 421 U.S. at 673–74, 95 S.Ct. at 1912 ("[T]he Government establishes a prima facie case when it introduces evidence ... that the defendant had, by reason of his position in the corporation, responsibility and authority either to prevent in the first instance, or promptly to correct, the violation complained of, and that he failed to do so.").[3]

At another point in her opinion, the Special Assistant phrased the relevant issue as whether Novicki properly "carr[ied] out his duty of inquiry." This suggests that Novicki was debarred because he "should have known" of Dale's misconduct—that is, because his position as president and chief executive officer gave him an obligation to seek out wrongdoing. *See RESTATEMENT (SECOND) OF TORTS* § 12 cmt. a (explaining that unlike "reason to know," " 'should know' implies that the actor owes another the duty of ascertaining the fact in question").

Still, somewhat confusingly, other language in the opinion suggests that the Special Assistant did apply the *Restatement* definition of "reason to know." Thus, the Special Assistant emphasized Novicki's knowledge of three facts: customer complaints about Dale's resistors, the 1987 DCIS searches, and DESC's subsequent reduction of Dale's "S" rating. She determined that "[t]he number of complaints, the similarity of problems, and the continuing nature of the problems were sufficient notice to a reasonable, responsible executive in Mr. Novicki's position that there could be systemic problems with Dale production." And she stated that Novicki's responses to the 1987 searches and reduced rating "[fell] short of what might reasonably be expected" of one in his position. The opinion could be read, then, as debarring Novicki because he was on notice of the misconduct as it was occurring, or because his response to the misconduct once he became aware of it was inadequate.

■ Assuming, however, that the agency official did apply the definition of "reason to know" that counsel agreed was appropriate—that is, giving the agency the benefit of the doubt—we do not think the record reasonably supports the agency's decision, because there is not substantial evidence to establish that Novicki had "reason to know." Dale's alleged wrongful acts occurred between 1982 and 1986, but according to Novicki's affidavit, which is undisputed, he only became aware of customer complaints by the "[f]all of 1986." Nothing in the record indicates that Novicki acquired any relevant information while the misconduct was still occurring.[4]

To be sure, the district judge observed that "reason to know" may be acquired after the alleged wrongdoing has ceased, *see Novicki*, 743 F.Supp. at 14, and appellant conceded at oral argument that post-misconduct information could have given Novicki "reason to know" if at the time he acquired the information he could have taken significant action to ward off the injurious consequences of Dale's misconduct. Nevertheless, the agency's decision is de-

---

**3.** *Park* does not control debarments under Section 9.406–5(b), because *Park* did not involve an interpretation of the phrase "reason to know." *See Caiola v. Carroll*, 851 F.2d 395, 399–400 (D.C.Cir.1988).

**4.** The last undisclosed test or field failure is dated November 1986. So, notwithstanding the implication in the government's brief, it is impossible to say on the record that Novicki acquired "reason to know" while the misconduct was still occurring. Fall, after all, is an imprecise term. *See, e.g., WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY* 818 (1971) (defining fall as "the season when leaves fall from the trees").

fective. Novicki's affidavit states only that he became "generally aware" of some customer complaints by the fall of 1986; there is no evidence that he was informed of "the number" of complaints, their "similarity," or their "continuing nature," either before or after the alleged misconduct occurred. Moreover, Novicki claimed that he was told that the complaints concerned problems that Dale had no obligation to report to DESC, and the agency did not explain why his understanding was unreasonable.

The government's brief argues that Novicki should have done something (exactly what is unclear) to remedy the situation. It is undisputed, however, that the company took action to correct problems with the QPL resistors in early 1987—action that satisfied all DESC requirements. We do not think it significant that these corrective actions were taken in response to the DESC audits, because there is no evidence that Novicki had reason to know of any problems before the audits occurred. Because the agency identifies no misconduct occurring after 1986, nor any further specific actions that Novicki should have taken,[5] Novicki's awareness of the 1987 searches is irrelevant, and there is no sub-

stantial evidence to support the agency's decision.

It is unnecessary, therefore, to determine whether the agency used an inappropriate legal standard—debarred Novicki merely because of his status—or misapplied the correct standard, or did both at the same time. Whichever, the district court's approval of the debarment cannot stand. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577–78, 91 L.Ed. 1995 (1947) (reviewing court cannot affirm an agency decision based on improper or ambiguous grounds). Accordingly, we reverse the district court's judgment and remand with instructions to vacate the debarment and return the case to the DLA for further proceedings consistent with this opinion.

*It is so ordered.*

---

5. The government's brief implies that Novicki could have provided better training and supervision for the executives who "perpetrated" the

misconduct at Dale. That theory, without more specificity, is merely another way of debarring Novicki because of his status.