United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued February 20, 1998 Decided May 15, 1998

 No. 97-1113

 
 BellSouth Corporation, 

 Petitioner

 v.

 Federal Communications Commission and 

 United States of America, 

 Respondents

 AT&T Corporation, et al., 

 Intervenors

 On Petition for Review of an Order of the 

 Federal Communications Commission

 Laurence H. Tribe argued the cause for petitioner. With 
him on the briefs were Jonathan S. Massey, Walter H. 
Alford, William B. Barfield, M. Robert Sutherland, Michael 
K. Kellogg, Mark L. Evans and Robert B. McKenna.


 Jacob M. Lewis, Attorney, U.S. Department of Justice, 
argued the cause for respondents. With him on the briefs 
were Frank W. Hunger, Assistant Attorney General, Stephen 
W. Preston, Deputy Assistant Attorney General, Mark B. 
Stern, Attorney, Christopher J. Wright, General Counsel, 
Federal Communications Commission, and John E. Ingle, 
Deputy Associate General Counsel. Catherine G. O'Sullivan 
and Nancy C. Garrison, Attorneys, U.S. Department of Jus-
tice, and Carl D. Lawson, Counsel, Federal Communications 
Commission, entered appearances.

 Donald B. Verrilli, Jr. argued the cause for intervenors 
AT&T Corp., and MCI Telecommunications Corp. With him 
on the brief were David W. Carpenter, Peter D. Keisler, 
Matthew B. Pachman, Mark C. Rosenblum and Roy E. 
Hoffinger. Frank W. Krogh entered an appearance.

 Before: Edwards, Chief Judge, Williams and Sentelle, 
Circuit Judges.

 Opinion for the Court filed by Circuit Judge Williams.

 Dissenting opinion filed by Circuit Judge Sentelle.

 Williams, Circuit Judge: Petitioner BellSouth Corporation 
challenges the constitutionality of Section 274 of the Telecom-
munications Act of 1996 (the "Act"), 47 U.S.C. s 274, and of 
the Federal Communications Commission's order implement-
ing that provision.1 Section 274 limits the ability of Bell 
operating companies ("BOCs") to provide "electronic publish-
ing," a category that includes disseminating news articles, 
offering literary material, and providing services similar to 
the Lexis/Nexis and Westlaw databases. BellSouth says 
s 274 is an unconstitutional bill of attainder, stressing the 
fact that the subjects of its restrictions, the BOCs, are singled 

__________
 1 The order under challenge is Implementation of the Telecom-
munications Act of 1996: Telemessaging, Electronic Publishing, 
and Alarm Monitoring Services, FCC No. 97-35 (Feb. 7, 1997). 
BellSouth's challenge to the order is entirely derivative of its 
constitutional challenge to the statute, with no claim that the FCC 
acted outside the scope of its statutory authority.


out by name. BellSouth also complains that s 274 impermis-
sibly abridges its First Amendment rights of free expression. 
We reject both challenges.

 

 * * *

 The story behind the Telecommunications Act of 1996 has 
often been told, although electronic publishing restrictions 
have usually amounted to little more than a subplot. In 1982 
a consent decree was entered in settlement of the govern-
ment's 1974 antitrust suit against AT&T. That decree, as 
modified by the district court, became known as the "Modifi-
cation of Final Judgment," or "MFJ." See United States v. 
American Tel. & Tel. Co., 552 F. Supp. 131 (D.D.C. 1982), 
aff'd sub nom. Maryland v. United States, 460 U.S. 1001 
(1983). The MFJ required AT&T to divest itself of its local 
exchange monopolies. Under the reorganization plan ap-
proved by the district court, the twenty BOCs eventually 
named in the 1996 Act were spun off from AT&T and 
grouped into seven regional Bell operating companies, or 
"RBOCs" (now five thanks to mergers), of which BellSouth is 
one.2

 The MFJ initially prohibited the BOCs from providing 
"information services," defined to include electronic publish-
ing. The prohibition rested on two concerns commonly 
voiced about regulated monopolists operating in fields adja-
cent to their monopolies. First, to the extent that the 
monopolist's good or service is an input for the adjacent 
industry, the monopolist may offer its own enterprise discrim-
inatory advantages, in this case "favorable access to the local 
network." 552 F. Supp. at 189. Second, the monopolist may 
use monopoly revenues to subsidize its associated enterprise. 
Id. In a "triennial review" process established by the decree, 
the Department of Justice moved to lift the information 
services restrictions, and no party to the decree opposed the 
motion. The district court ultimately did lift them. United 
States v. Western Electric Co., 767 F. Supp. 308 (D.D.C. 

__________
 2 AT&T also divested its minority holdings in the Cincinnati Bell 
Telephone Company and the Southern New England Telephone 
Company, which are not classified as BOCs in the Act.


1991), aff'd, 993 F.2d 1572 (D.C. Cir. 1993). We will return 
later to the analysis supporting that result, which BellSouth 
says helps its constitutional case against s 274.

 The 1996 Act rescinded the MFJ, see Pub. L. No. 104-104, 
s 601, 110 Stat. 143 (1996), and changed the entire telecom-
munications landscape. Several key provisions of the Act 
apply to incumbent local exchange carriers generally, such as 
47 U.S.C. s 251, requiring them to offer nondiscriminatory 
access and interconnection to local competitors. Sections 271 
through 276 of the Act, however, entitled "Special Provisions 
Concerning Bell Operating Companies," are applicable to the 
BOCs and their affiliates alone.3 For example, s 271 estab-
lishes requirements that must be met before the BOCs can 
break into the long distance, or "interLATA," market, see 
SBC Communications, Inc. v. FCC, 1998 WL 121492 (D.C. 
Cir. Mar. 20, 1998); s 273 bars the BOCs from manufactur-

__________
 3 The Act defines "Bell operating company" as follows:

The term "Bell operating company"--

 (A) means any of the following companies: Bell Telephone 
 Company of Nevada, Illinois Bell Telephone Company, Indiana 
 Bell Telephone Company, Incorporated, Michigan Bell Tele-
 phone Company, New England Telephone and Telegraph Com-
 pany, New Jersey Bell Telephone Company, New York Tele-
 phone Company, US West Communications Company, South 
 Central Bell Telephone Company, Southern Bell Telephone and 
 Telegraph Company, Southwestern Bell Telephone Company, 
 The Bell Telephone Company of Pennsylvania, The Chesapeake 
 and Potomac Telephone Company, The Chesapeake and Poto-
 mac Telephone Company of Maryland, The Chesapeake and 
 Potomac Telephone Company of Virginia, The Chesapeake and 
 Potomac Telephone Company of West Virginia, The Diamond 
 State Telephone Company, The Ohio Bell Telephone Company, 
 The Pacific Telephone and Telegraph Company, or Wisconsin 
 Telephone Company; and

 (B) includes any successor or assign of any such company 
 that provides wireline telephone exchange service; but

 (C) does not include an affiliate of any such company, other 
 than an affiliate described in subparagraph (A) or (B).

47 U.S.C. s 153(4).


ing and selling telecommunications equipment until they have 
received authorization to enter the interLATA market; and 
s 275 prohibits BOCs (other than Ameritech) from providing 
alarm monitoring services for five years, see Alarm Industry 
Communications Committee v. FCC, 131 F.3d 1066, 1067 
(D.C. Cir. 1997). In general these provisions simply main-
tained, and in most cases loosened, various restrictions to 
which the BOCs were already subject under the MFJ. By 
contrast, the provision at issue here--s 274--reimposed on 
the BOCs some of the information services restrictions that 
had been lifted in 1991. BellSouth challenges only that 
provision and the FCC order of implementation.4

 Section 274 provides:

 No Bell operating company or any affiliate may engage 
 in the provision of electronic publishing that is dissemi-
 nated by means of such Bell operating company's or any 
 of its affiliates' basic telephone service, except that noth-
 ing in this section shall prohibit a separated affiliate or 
 electronic publishing joint venture operated in accor-
 dance with this section from engaging in the provision of 
 electronic publishing.

47 U.S.C. s 274(a). Section 274's restrictions expire on Feb-
ruary 8, 2000, four years from the date of the Act's passage. 
s 274(g)(2).

 As is evident from its text, s 274 provides two pathways for 
BOCs wishing to enter electronic publishing: the "separated 
affiliate" route and the "joint venture" route. The statute 
defines a separated affiliate as "a corporation under common 
ownership or control with a Bell operating company that does 
not own or control a Bell operating company and is not owned 
or controlled by a Bell operating company." 47 U.S.C. 
s 274(i)(9). An "electronic publishing joint venture" is a 
"joint venture owned by a Bell operating company or affiliate 

__________
 4 We note that another RBOC has launched a Bill of Attainder 
Clause and First Amendment challenge to the "Special Provisions" 
as a whole. See SBC Communications, Inc. v. FCC, 981 F. Supp. 
996 (N.D. Tex. 1997).


that engages in the provision of electronic publishing which is 
disseminated by means of such Bell operating company's or 
any of its affiliates' basic telephone service." 47 U.S.C. 
s 274(i)(5). Section 274 imposes several structural require-
ments on both separated affiliates and electronic publishing 
joint ventures. See generally 47 U.S.C. s 274(b). For exam-
ple, each such entity must maintain books, records, and 
accounts separately from the BOC with which it is affiliated, 
s 274(b)(1), may have "no officers, directors, and employees 
in common" with a BOC, s 274(b)(5)(A), and may "own no 
property in common," s 274(b)(5)(B).

 The Act defines "electronic publishing" broadly as

 the dissemination, provision, publication, or sale to an 
 unaffiliated entity or person, of any one or more of the 
 following: news (including sports); entertainment (oth-
 er than interactive games); business, financial, legal, 
 consumer, or credit materials; editorials, columns, or 
 features; advertising; photos or images; archival or re-
 search material; legal notices or public records; scien-
 tific, educational, instructional, technical, professional, 
 trade, or other literary materials; or other like or simi-
 lar information.

47 U.S.C. s 274(h)(1). It then exempts several types of 
services, including data processing, voice messaging, and 
video programming. 47 U.S.C. s 274(h)(2).

 BellSouth, of course, is not a BOC but an RBOC. Yet the 
government rightly refrains from raising a standing defense 
on that ground. The injury BellSouth suffered as the sole 
shareholder of two affected corporations (South Central Bell 
Telephone Company and Southern Bell Telephone and Tele-
graph Company) is clearly enough to give it Article III 
standing. See Franchise Tax Board of California v. Alcan 
Aluminium Ltd., 493 U.S. 331, 336 (1990). Besides, as an 
affiliate of two BOCs, s 274(i)(1), BellSouth is itself affected; 
it can engage in electronic publishing only by maintaining 
structural separation from its BOCs.


Bill of Attainder Challenge

 We turn first to BellSouth's challenge under Article I, 
section 9, clause 3 of the Constitution, which says that "[n]o 
Bill of Attainder or ex post facto Law shall be passed" by 
Congress. For the framers of the Constitution the term 
"bills of attainder" carried a specific meaning: it referred to 
parliamentary acts sentencing named persons to death with-
out the benefit of a judicial trial. As early as 1810, however, 
in Fletcher v. Peck, 10 U.S. (6 Cranch) 87 (1810), Chief Justice 
Marshall noted in dictum that the prohibition on bills of 
attainder ought to extend to legislation subjecting specified 
persons to penalties short of death--what the framers called 
"bills of pains and penalties." Id. at 138; United States v. 
Brown, 381 U.S. 437, 447 (1965). Later in the nineteenth 
century the Supreme Court confirmed that the legislative 
punishments foreclosed by the Bill of Attainder Clause in-
clude bills of pains and penalties. Cummings v. Missouri, 71 
U.S. (4 Wall.) 277, 320, 323 (1866). Moreover, the Court has 
recognized that not all bills of attainder expressly name their 
targets; some simply describe them. Brown, 381 U.S. at 442. 
In sum, the Court has developed a potentially sweeping 
definition of forbidden attainders, holding that "legislative 
acts, no matter what their form, that apply either to named 
individuals or to easily ascertainable members of a group in 
such a way as to inflict punishment on them without a judicial 
trial are bills of attainder prohibited by the Constitution." 
United States v. Lovett, 328 U.S. 303, 315-16 (1946). The 
result is a prohibition triggered when a legislative act meets 
two tests--first, that it apply with specificity, and second, that 
it impose punishment.

 Even classic attainders seem not only to have specified 
individuals but also classes--defined as the confederates of a 
named traitor, as in the case of the attainder against the Earl 
of Kildare and his associates during the reign of Henry VIII. 
See Cummings, 71 U.S. at 323-24. But the Supreme Court 
watered down the specificity requirement a bit more when it 
invalidated two post-Civil War enactments targeting all per-
sons who could not truthfully swear that they had been loyal 
to the Union during the war. See Cummings; Ex parte 


Garland, 71 U.S. (4 Wall.) 333 (1866). And in Lovett it said 
generally that specificity is shown if the law applies to "easily 
ascertainable members of a group." 328 U.S. at 315. Since 
virtually all legislation operates by identifying the character-
istics of the class to be benefited or burdened, it is not clear 
that the specificity requirement retains any real bite. In any 
event, it is obviously met here, since s 274's requirements 
apply uniquely to the twenty BOCs identified by name in the 
Act.

 We assume, as do the parties, that the Bill of Attainder 
Clause protects corporations as well as individuals. Although 
the Supreme Court has yet to address the question directly, it 
has suggested as much in dictum, see Plaut v. Spendthrift 
Farm, Inc., 514 U.S. 211, 239 n.9 (1995) (indicating that Bill of 
Attainder Clause applies to laws that burden "a single indi-
vidual or firm"), and comparable constitutional rights have 
been extended to legal "persons" taking the corporate form. 
See, e.g., Metropolitan Life Ins. Co. v. Ward, 470 U.S. 869, 
881 n.9 (1985) (equal protection); United States v. Martin 
Linen Supply Co., 430 U.S. 564 (1977) (double jeopardy). 
The clause's coverage clearly seems to include at least closely 
held corporations, where an attainder would fall on a narrow-
ly circumscribed, easily identified group of flesh-and-blood 
people.5 Given the parties' shared assumption, we will not 
explore the issue further.

 At times BellSouth comes close to arguing that the specifi-
cation requirement ought to be the end of the matter. On 
this view, the Bill of Attainder Clause bars Congress from 
singling out a specified class of persons for burdens of any 
kind, regardless of whether those burdens can be viewed as 
punishments in any ordinary sense of the term. This was the 

__________
 5 At least it would do so if it took the form of a conventional 
penalty such as a fine. If it took the form of a restriction barring 
certain closely held corporations from specific lines of business, its 
effect on flesh-and-blood people would depend on the language of 
the restriction and on the ability of officers, directors and share-
holders to carry on their pursuits outside the named corporations. 
See below at pp. 12-13.


theme of a famous student essay, Note, The Bounds of 
Legislative Specification: A Suggested Approach to the Bill 
of Attainder Clause, 72 Yale L.J. 330 (1962), and traces of the 
same approach can be found in the Supreme Court's most 
extensive discussion (and most expansive application) of the 
clause, United States v. Brown, 381 U.S. 437, 442 (1965). For 
example, Brown said in a footnote that "a legislature can 
provide that persons possessing certain characteristics must 
abstain from certain activities, but must leave to other 
tribunals the task of deciding who possesses those character-
istics." Id. at 454 n.29 (emphasis added). And Brown's 
explanation of the clause "as an implementation of the separa-
tion of powers, a general safeguard against legislative exer-
cise of the judicial function, or more simply--trial by legisla-
ture," id. at 442, certainly lent itself to sweeping application. 
Nonetheless, even Brown seemed at times to limit itself to 
punishments, saying, for example, that the clause "reflected 
the Framers' belief that the Legislative Branch is not so well 
suited as politically independent judges and juries to the task 
of ruling upon the blameworthiness of, and levying appropri-
ate punishment upon, specific persons." Id. at 445. Such a 
limitation is practically indispensable: given the demise of the 
requirement that a forbidden attainder fall on named individ-
uals, and the elusive character of Brown's own effort to 
articulate a coherent specificity test to replace that require-
ment, see 381 U.S. at 455 n.29, a definition of attainder that 
encompassed any burden imposed on specified individuals or 
groups would cut a broad swath, mowing down much of the 
Supreme Court's equal protection jurisprudence at a single 
stroke.

 In any event, whatever Brown's potential for diluting the 
punishment requirement, the Supreme Court has since taken 
that requirement seriously. It made this emphatically clear 
in Nixon v. Administrator of General Services, 433 U.S. 425 
(1977), where the law at issue burdened a single person. 
Despite the statute's surgical focus on a sole individual, the 
Court held that "the mere specificity of a law does not call 
into play the Bill of Attainder Clause," id. at 471 n.33, and 
indeed that Congress had on that occasion singled out "a 


legitimate class of one," id. at 472.6 It insisted that the 
burden must be a punishment to qualify as a bill of attainder, 
and considered three questions in determining whether it 
was. Id. at 478-84. Despite Chief Justice Burger's sugges-
tion that the Nixon precedent itself would become a "class of 
one," id. at 544-45 (Burger, C.J., dissenting), the Court later 
formalized the punishment inquiry into a three-part test, 
asking

 (1) whether the challenged statute falls within the histor-
 ical meaning of legislative punishment; (2) whether the 
 statute, viewed in terms of the type and severity of 
 burdens imposed, reasonably can be said to further 
 nonpunitive legislative purposes; and (3) whether the 
 legislative record evinces a congressional intent to pun-
 ish.

Selective Service System v. Minnesota Public Interest Re-
search Group, 468 U.S. 841, 852 (1984) (citations and internal 
quotation marks omitted). Unlike our dissenting colleague, 
Dissent at 3, 5, 6, we see no warrant in the precedents for 
treating Congress's specification of the BOCs by name as a 
material element in the punishment analysis. Cf. Brown, 381 
U.S. at 461 (describing supposed contrast between naming 
and mere specification as a "distinction[ ] without a differ-
ence"). We take up each of the three factors in turn.

 To begin with, s 274's restrictions are nothing like the 
classic attainders known to the framers. As mentioned 
above, bills of attainder at common law generally entailed 
execution, although this was typically coupled with other 
punishments, such as "corruption of blood," which prevented 

__________
 6 See also Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 239 n.9 
(1995) ("[L]aws that impose a duty or liability upon a single 
individual or firm are not on that account invalid--or else we would 
not have the extensive jurisprudence that we do concerning the Bill 
of Attainder Clause, including cases which say that it requires not 
merely 'singling out' but also punishment, see, e.g., United States v. 
Lovett, 328 U.S. 303, 315-18 (1946), and a case which says that 
Congress may legislate 'a legitimate class of one,' Nixon v. Admin-
istrator of General Services, 433 U.S. 425, 472 (1977).")


the attainted party's heirs from inheriting his property. See 
Brown, 381 U.S. at 441. Bills of pains and penalties, also 
forbidden by the clause, "commonly imposed imprisonment, 
banishment, and the punitive confiscation of property." Se-
lective Service System, 468 U.S. at 852.

 The case becomes closer when we move from historic 
antecedents to burdens later found by the Supreme Court to 
rank as punishments, which have included "legislative bars to 
participation by individuals or groups in specific employments 
or professions." Id. at 852. Indeed, the Court's four major 
decisions invalidating statutes on Bill of Attainder Clause 
grounds have all involved legislation preventing specific 
classes of persons from pursuing certain occupations. Those 
four cases came in two pairs. The first pair involved restric-
tions imposed immediately after the Civil War on those who 
had sided with the South, see Cummings (striking down 
amendments to Missouri constitution denying right to vote, 
hold office, teach, or serve as trustee for religious organiza-
tion to persons who aided or sympathized with the Confedera-
cy), and Garland (striking down federal law requiring attor-
neys to swear oath that they had never assisted Confederacy 
as condition of admission to practice in federal courts).7 The 
second pair involved restrictions on Communist Party mem-
bers during the Cold War, see Lovett (invalidating law cutting 
off payment of salaries to three named federal employees who 
were Party members), and Brown (invalidating law making it 
a crime for members of Party to serve as officers or employ-
ees of labor unions).

 Although a statute imposing structural separations on cor-
porations seeking to engage in specific types of commercial 
activity may be analogous to such traditional employment 
debarments, the analogy is very loose indeed. Even if we 
ignore the BOCs' freedom under s 274 to enter electronic 
publishing through structurally separated affiliates, the sec-
tion is nothing more than a line-of-business restriction, com-

__________
 7 See also Pierce v. Carskadon, 83 U.S. (16 Wall.) 234 (1872) 
(memorandum opinion striking down West Virginia loyalty oath 
similar to those invalidated in Cummings and Garland).


parable for example to the Glass-Steagall Act's limitation on 
the entry of commercial banks into investment banking, 12 
U.S.C. ss 24 (Seventh), 78, or to the cross-ownership restric-
tions on broadcasters upheld in FCC v. National Citizens 
Committee for Broadcasting, 436 U.S. 775 (1978). Although 
membership in the class of commercial banks or broadcasting 
firms is easy enough to ascertain, no one has suggested that 
those laws work an unconstitutional attainder. Indeed the 
Supreme Court in Brown strongly suggested that line-of-
business restrictions pose no bill of attainder concerns, distin-
guishing the statute at issue there, which barred Communists 
from high office in labor unions, from s 32 of the Banking Act 
of 1933 (now codified at 12 U.S.C. s 78), a conflict-of-interest 
statute preventing employees of securities underwriting firms 
from working for banks that belong to the Federal Reserve 
System. Brown, 381 U.S. at 453-55; see also Board of 
Governors v. Agnew, 329 U.S. 441 (1947) (upholding s 32 of 
Banking Act, though without addressing bill of attainder 
issue). Brown reasoned that each of the invalidated employ-
ment prohibitions "inflict[ed] its deprivation upon the mem-
bers of a political group thought to present a threat to the 
national security," 381 U.S. at 453, and further contrasted the 
conflict-of-interest statute as "incorporat[ing] no judgment 
censuring or condemning any man or group of men." Id. at 
453-54. It is apparent--and will be more so when we exam-
ine legislative purpose--that s 274 falls on the nonpunitive 
side of those lines.

 Placing s 274 among the burdens historically forbidden as 
attainders seems especially dubious because it does not bar 
the BOCs from electronic publishing but simply requires 
structural separation. As counsel for BellSouth acknowl-
edged at oral argument, the separated affiliate mechanism 
permits his client to establish a wholly-owned subsidiary to 
pursue electronic publishing. This subsidiary could dissemi-
nate materials over the telephone lines of BellSouth's BOC 
subsidiaries, as long as it was kept separate from them in the 
ways prescribed by s 274(b). Indeed, BellSouth itself could 
enter the electronic publishing business provided it observed 
the norms of separation from its BOCs. In short, s 274 


leaves all the investors with stakes in the BOCs (i.e., the 
shareholders of the RBOCs) free to pursue their collective 
electronic publishing ends, and to aggregate their capital to 
achieve those ends, subject only to structural separation 
requirements. While structural separation is hardly costless, 
neither does it remotely approach the disabilities that have 
traditionally marked forbidden attainders.

 The second criterion asks whether the challenged legisla-
tion, considering the type and severity of the burdens it 
imposes, can reasonably be said to further nonpunitive legis-
lative purposes. This factor appears to be the most impor-
tant of the three. See Siegel v. Lyng, 851 F.2d 412, 418 (D.C. 
Cir. 1988) ("The line of Supreme Court law on the Bill of 
Attainder Clause indicates that legislation will survive Bill of 
Attainder attack if the statute furthers nonpunitive legislative 
purposes."). On the one hand, where an enactment falls 
outside the historical definition of punishment, the second 
factor prevents Congress from circumventing the clause by 
cooking up newfangled ways to punish disfavored individuals 
or groups. Selective Service System, 468 U.S. at 853-54. On 
the other hand, "[e]ven measures historically associated with 
punishment--such as permanent exclusion from an occupa-
tion--have been otherwise regarded when the nonpunitive 
aims of an apparently prophylactic measure have seemed 
sufficiently clear and convincing." Laurence H. Tribe, Amer-
ican Constitutional Law, s 10-5, at 655 (2d ed. 1988).

 In fact, apart from its specific targeting aspect, we find that 
s 274 has the earmarks of a rather conventional response to 
commonly perceived risks of anticompetitive behavior. We 
have long recognized that structural separation is "a permissi-
ble regulatory tool" for ensuring "that no cross-subsidization 
or unfair competitive practices occur." Computer and Com-
munications Industry Ass'n v. FCC, 693 F.2d 198, 219 (D.C. 
Cir. 1982). We return shortly to the realism of those risks, 
but pause here to note that BellSouth's claim of punitive 
purpose is somewhat undermined by s 274's placement in an 
Act that as a whole relieves the BOCs of several of the 
burdens imposed by the MFJ, particularly by prescribing in 


s 271 a method whereby the BOCs can achieve a long-sought-
after presence in the long-distance market.8

 BellSouth advances two arguments in support of its claim 
that Congress cannot reasonably be said to have enacted 
s 274 for nonpunitive purposes. First, it says the court's 
1991 removal of the information services prohibition from the 
MFJ--based on a finding that its removal could reasonably 
be found to advance the public interest (balancing the risk of 
BOC discrimination against competing information services 
ventures with the competitive benefits of BOC entry)--shows 
that Congress in 1996 had no plausible economic basis for 
reimposing electronic publishing restrictions. Second, Bell-
South points to other local exchange carriers who are not 
covered by s 274's proscriptions. To the extent the BOCs 
pose any anticompetitive threat, says BellSouth, then so do 
the excluded firms, and their exclusion demonstrates that 
Congress's real aim was to punish the BOCs.

 As we said earlier, the information services ban was lifted 
from the MFJ at the behest of the Department of Justice, 
which had insisted on the ban when the MFJ was being 
negotiated. Circumstances had changed, the government 
argued; the information services market had become more 
competitive, and the BOCs' ability to discriminate and cross-
subsidize had consequently decreased. The district court 
initially rejected the government's proposal, United States v. 
Western Electric Co., 673 F. Supp. 525, 587-97 (D.D.C. 1987), 
but we reversed, saying that the court had used too stringent 
a standard to evaluate the government's motion, which no 
party to the consent decree had opposed. United States v. 
Western Electric Co., 900 F.2d 283, 292 (D.C. Cir. 1990). On 
remand the district court lifted the information services ban. 
United States v. Western Electric Co., 767 F. Supp. 308 
(D.D.C. 1991). We affirmed, noting that under the applicable 

__________
 8 Because we find no attainder, we need not wrestle with the issue 
of remedy. Severability is largely a matter of legislative intent, and 
it is doubtful that Congress would have intended the many provi-
sions of the Act beneficial to the BOCs to survive deletion of this 
burdensome one.


"public interest" standard "the record before the court was 
such that any district court rejection of the proposed modifi-
cation would have been reversible error." United States v. 
Western Electric Co., 993 F.2d 1572, 1577-78 (D.C. Cir. 1993). 
That record, we said, contained "persuasive evidence that, 
despite their local monopoly power, the BOCs will be unable 
to discriminate against competing information service provid-
ers." Id. at 1579-80. We also concluded that there was 
powerful evidence to counter any suggestion that the BOCs 
would be able to use their price-regulated monopolies to 
subsidize their entry into information services. Id. at 1580-
81.

 Obviously Congress's reading of the evidence in 1996 was 
different from the one arrived at by the Department of 
Justice in 1987--or by this court in 1993 for that matter. It 
does not follow from these conflicts between branches, howev-
er, that Congress cannot rationally be said to have pursued 
nonpunitive purposes in enacting s 274. Certainly our trien-
nial review decisions never suggested that the risks of anti-
competitive conduct were so feeble that no one could reason-
ably assert them except as a smokescreen for some invidious 
purpose (much less for the specific invidious purpose of 
"punishing" the BOCs). And we note that s 274 is less 
severe than the analogous pre-1991 MFJ provision along 
several dimensions: it applies only to electronic publishing 
rather than to information services as a whole, it expires after 
five years rather than continuing indefinitely, and it mandates 
structural separation rather than complete exclusion.

 BellSouth complains that this reading of the second factor 
reduces it to little more than a rational basis test, the most 
anemic form of constitutional scrutiny. If this were strictly 
true, of course, the Bill of Attainder Clause (as applied to 
non-suspect classes such as the BOCs) would do nothing more 
than duplicate the Equal Protection Clause. But the Su-
preme Court's attainder inquiry is in fact more exacting than 
a rational basis test, because it demands purposes that are 
not merely reasonable but nonpunitive. Punitive purposes, 
however rational, don't count.


 BellSouth's second argument focuses on the fact that s 271 
does not cover several large non-BOC local exchange carriers, 
in particular GTE Corporation.9 GTE, which was never part 
of the AT&T system, supplies about 18.4 million access lines 
in 27 states; by comparison, BellSouth supplies about 24.5 
million access lines in nine states. 1996 FCC Statistics of 
Communications Common Carriers 21 (1997). Although its 
operations are generally rural, as of 1993 "GTE control[led] 
local exchange service in the entire state of Hawaii as well as 
in large portions of the Tampa and Los Angeles markets." 
United States v. Western Electric Co., 993 F.2d at 1579. 
Other non-BOC carriers, such as Southern New England 
Telephone with about 2.1 million access lines in Connecticut, 
are also not covered by s 274. 1996 FCC Statistics of 
Communications Common Carriers 21 (1997). From this 
selectivity--which BellSouth labels underinclusiveness--Bell-
South would have us draw an inference of punitive purpose.

 But the differential treatment of the BOCs and non-BOCs 
is neither suggestive of punitive purpose nor particularly 
suspicious. Because the BOCs' facilities are generally less 
dispersed than GTE's, they can exercise bottleneck control 
over both ends of a telephone call in a higher fraction of cases 
than can GTE. The BOCs thus enjoy a materially greater 
opportunity to shift costs from their electronic publishing 
pursuits to their rate-regulated local exchange ventures.10 In 

__________
 9 Like the BOCs, GTE was subject to a consent decree for more 
than a decade, until the passage of the Act. The decree, however, 
permitted GTE to provide information services, subject to structur-
al separation and non-discrimination requirements. See United 
States v. GTE Corp., 603 F. Supp. 730, 742 (D.D.C. 1984).

 10 While in 1993 we somewhat disparaged the distinction then 
drawn between GTE and the BOCs on the basis of relative disper-
sion, United States v. Western Electric Co., 993 F.2d at 1579, we did 
so solely with respect to the claim of discrimination against compet-
ing providers. Our reasoning was that the BOCs could not easily 
sort out information services transmissions, or intra-corporate 
transmissions, on the customer end of a call, as they would have to 
do in order to discriminate efficiently. Id. That deficiency would 
not seem to impede cost-shifting, where the regulated monopoly 


addition, because GTE (unlike the BOCs) is not the dominant 
provider of local exchange service in any state except Hawaii, 
state regulators can use the costs of its local competitors as 
benchmarks against which to measure whether it is engaging 
in improper cost allocation. Thus the distinction drawn by 
Congress seems quite understandable without resort to infer-
ences of punitive purpose.

 The third device for identifying a punishment focuses on 
legislative intent, and in practice appears to differ from the 
second only in inviting a journey through legislative history. 
On this point we can be brief. BellSouth simply has not come 
forward with the kind of "unmistakable evidence of punitive 
intent which ... is required before a Congressional enact-
ment of this kind may be struck down" as an attainder. 
Selective Service System, 468 U.S. at 855-56 n.15 (quoting 
Flemming v. Nestor, 363 U.S. 603, 619 (1960)). Aside from a 
few scattered remarks referring to anticompetitive abuses 
allegedly committed by the BOCs in the past, BellSouth has 
provided no legislative history even touching on the purposes 
behind s 274, much less presenting "smoking gun" evidence 
of congressional vindictiveness.

 In sum, we hold that s 274 is not a bill of attainder.

First Amendment Challenge

 BellSouth complains that s 274 abridges its constitutional 
right of free speech by restricting its ability to provide 
electronic publishing. Clearly the structural separation re-
quirements regulate expressive activity within the scope of 
the First Amendment. So, as is often the case in the First 
Amendment arena, the parties devote much of their energy 
toward disputing the appropriate standard of review. Bell-
South argues that s 274 warrants strict scrutiny for two 
reasons: first, because it singles out named corporations for 
speech restrictions, and second, because it is content-based. 
The FCC says that s 274 is a content-neutral regulation and 

__________
attempts to deceive regulators about which costs belong in the 
regulated enterprise and which in the other.


should instead be evaluated under the intermediate standard 
of review applied by the Supreme Court in its decisions 
upholding the cable television "must-carry" rules. See Tur-
ner Broadcasting System, Inc. v. FCC, 512 U.S. 622 (1994) 
("Turner I") (determining that intermediate scrutiny applied); 
Turner Broadcasting System, Inc. v. FCC, 117 S. Ct. 1186 
(1997) ("Turner II") (upholding must-carry provisions under 
intermediate scrutiny). We agree with the FCC that an 
intermediate level of scrutiny is appropriate.

 We begin with BellSouth's claim that s 274 warrants strict 
First Amendment review because it targets named corpora-
tions. In support of this claim BellSouth cites our decision in 
News America Publishing, Inc. v. FCC, 844 F.2d 800 (D.C. 
Cir. 1988). That case concerned a provision that prohibited 
the FCC from granting extensions of temporary waivers of 
the newspaper/television cross-ownership rules to all then-
current holders of such temporary waivers--a class of one, as 
it turned out. We struck down the provision on First Amend-
ment and equal protection grounds, noting that "[w]here 
legislation affecting speech appears underinclusive, i.e., where 
it singles out some conduct for adverse treatment, and leaves 
untouched conduct that seems indistinguishable in terms of 
the law's ostensible purpose, the omission is bound to raise a 
suspicion that the law's true target is the message." Id. at 
804-05. Contrary to BellSouth's assertion, however, News 
America does not stand for the proposition that statutes 
singling out particular persons for speech restrictions auto-
matically merit strict scrutiny. In fact we chose among 
standards only to the extent of saying that the provision could 
not survive any standard of review more exacting than a 
rational basis test. Id. at 802, 814.

 Only marginally more promising for BellSouth are the 
Supreme Court's decisions in Minneapolis Star & Tribune 
Co. v. Minnesota Commissioner of Revenue, 460 U.S. 575 
(1983), and Arkansas Writers' Project v. Ragland, 481 U.S. 
221 (1987). In both cases the Court applied strict scrutiny to 
invalidate state tax laws that had the effect of disproportion-
ately burdening certain segments of the press. In Minne-
apolis Star, because the challenged use tax exempted the 


first $100,000 in ink and paper consumed by a publication in a 
given year, its burden was borne by fewer than one in twenty 
newspapers in the state, with two-thirds of it landing on one 
publisher alone. 460 U.S. at 578-79. The sales tax struck 
down in Arkansas Writers' Project appeared to spread its net 
more broadly, covering general interest magazines but ex-
empting newspapers and religious, professional, trade, and 
sports magazines. 481 U.S. at 224. In fact, however, "the 
magazine exemption mean[t] that only a few Arkansas maga-
zines pa[id] any sales tax," giving the tax a targeting effect 
comparable to that of the Minneapolis Star tax. Id. at 229. 
The Supreme Court has explained the two cases as meaning 
only that strict scrutiny must be applied to regulations that 
target a small subset of media organizations in ways that 
threaten to "distort the market for ideas." Turner I, 512 
U.S. at 660 (quoting Leathers v. Medlock, 499 U.S. 439, 448 
(1991)). The Court has expressly declined to draw the broad 
lesson "that the First Amendment mandates strict scrutiny 
for any speech regulation that applies to one medium (or a 
subset thereof) but not others." Turner I, 512 U.S. at 660.11

 News America, Minneapolis Star, and Arkansas Writers' 
Project all featured some suggestion that the legislature's 
differential treatment of speakers was motivated by the con-
tent of their speech. See Turner I, 512 U.S. at 660 ("Al-
though there was no evidence that an illicit governmental 
motive was behind either of the taxes, both were structured 
in a manner that raised suspicions that their objective was, in 
fact, the suppression of certain ideas.").12 It is that sugges-
tion, rather than the act of "singling out" by itself, that 
triggers strict First Amendment scrutiny, as Turner I made 
clear. See id. at 658 ("[S]peaker-based laws demand strict 

__________
 11 In a similar vein, we have described Minneapolis Star and 
Arkansas Writers' Project as "likely addressed only to the special 
complexities of taxation." Walsh v. Brady, 927 F.2d 1229, 1236 
(D.C. Cir. 1991).

 12 In fact, the tax exemption challenged in Arkansas Writers' 
Project facially excluded certain publications on the basis of their 
content, rendering it especially suspect. 481 U.S. at 229-30.


scrutiny when they reflect the Government's preference for 
the substance of what the favored speakers have to say (or 
aversion to what the disfavored speakers have to say).").

 Here, there is no indication that s 274's coverage was 
limited to the BOCs because of any concern about the content 
of their speech--no indication, in other words, that "the 
legislature's speaker preference reflects a content prefer-
ence." Id. "So long as they are not a subtle means of 
exercising a content preference, speaker distinctions of this 
nature are not presumed invalid under the First Amend-
ment." Id. at 645. In addition, Turner I held that "height-
ened scrutiny is unwarranted when the differential treatment 
is 'justified by some special characteristic of' the particular 
medium being regulated." Id. at 660-61 (quoting Minne-
apolis Star, 460 U.S. at 575). Congress's imposition of 
structural separation on the BOCs because of their status as 
price-regulated bottleneck monopolies is certainly no more 
suggestive of any effort to exercise a content preference than 
were the must-carry provisions upheld in Turner, see Turner 
I, 512 U.S. at 661 (identifying "bottleneck monopoly power" 
held by cable operators as a special characteristic of the cable 
medium).

 We turn next to BellSouth's claim that s 274 is expressly 
formulated in terms of content, and thus requires strict 
scrutiny. To be sure, s 274 defines the field of expression to 
which it applies by reference to a set of categories that might 
in a formal sense be described as content-based. Thus it 
covers items such as "news," "entertainment," and "research 
material," and exempts information such as "video program-
ming," "voice messaging," and "data processing." See 
s 274(h)(1).

 Nothing about the provision, however, suggests an underly-
ing purpose to favor or disfavor particular viewpoints, nor 
does BellSouth advance such a suggestion. The Supreme 
Court has held that statutes lacking such a purpose are likely 
to be deemed content-neutral. "[L]aws that confer benefits 
or impose burdens on speech without reference to the ideas 
or views expressed are in most instances content-neutral." 


Turner I, 512 U.S. at 643. Indeed the very breadth of 
s 274's categories undermines any claim that Congress 
adopted a categorical approach out of a desire to favor any 
particular viewpoint or idea. Further, to a large extent 
neutrality is now gauged by reference to a statute's justifica-
tions: "Government regulation of expressive activity is con-
tent neutral so long as it is justified without reference to the 
content of the regulated speech." Ward v. Rock Against 
Racism, 491 U.S. 781, 791 (1989) (emphasis in original) (cita-
tion omitted). The goal of remedying bottleneck problems is 
independent of content and viewpoint.

 In summary, then--despite BellSouth's twin contentions 
that s 274 favors certain speakers, and certain types of 
speech, over others--we hold that intermediate scrutiny is 
appropriate because here, perhaps even more than in Turner, 
there is simply no hint that "the government has adopted a 
regulation of speech because of [agreement or] disagreement 
with the message it conveys." Turner I, 512 U.S. at 642 
(quoting Ward, 491 U.S. at 791).

 A regulation will be upheld under intermediate scrutiny "if 
it advances important governmental interests unrelated to the 
suppression of free speech and does not burden substantially 
more speech than necessary to further those interests." Tur-
ner II, 117 S. Ct. at 1186 (citing United States v. O'Brien, 391 
U.S. 367, 377 (1968)). The requirement of an important 
governmental interest is amply met here. The asserted 
interest underlying s 274 is to promote competition by dis-
couraging discrimination and cross-subsidization by the 
BOCs. This is not only important, see Turner I, 512 U.S. at 
644, but "unrelated to the suppression of free speech"; in-
deed, the interest in preventing truly anticompetitive behav-
ior in the electronic publishing marketplace is an interest in 
the enhancement of speech. Cf. id. at 663.

 Under intermediate scrutiny, while the government obvi-
ously need not meet the most rigorous standard of "narrow 
tailoring," it must nonetheless "demonstrate that the recited 
harms are real, not merely conjectural, and that the regula-
tion will in fact alleviate these harms in a direct and material 


way." Id. at 664. In determining whether the government 
has made this showing, we owe Congress's economic judg-
ments considerable deference, so as not to "infringe on tradi-
tional legislative authority to make predictive judgments 
when enacting nationwide regulatory policy." Turner II, 117 
S. Ct. at 1189; see also id. at 1203-05 (Breyer, J., concurring) 
(deferring to Congress's non-economic objectives). Aside 
from noting the various executive branch (and judicial) posi-
tions taken in connection with removal of the MFJ's restric-
tion, which bear no more weight here than in the bill of 
attainder analysis, see pp. 11-12 above, BellSouth does not 
claim that Congress's apparent concern about anticompetitive 
risks was unreasonable.

 But it does complain that Congress could have guarded 
against these risks through less speech-restrictive methods, 
for instance by imposing non-structural safeguards such as 
accounting requirements. Intermediate First Amendment 
scrutiny, however, does not entail a "least restrictive means" 
analysis. See Turner II, 117 S. Ct. at 1199-1200. It is at 
least plausible that structural separation will more effectively 
meet the perceived anticompetitive threat than would lesser 
restrictions, and although BellSouth characterizes the addi-
tional burden of structural separation as "enormous" (com-
pared with, for example, special accounting rules), it offers 
neither detail nor quantitative evidence to support this char-
acterization.

 As in its bill of attainder attack, BellSouth points to the 
exclusion of GTE and other non-BOC local exchange carriers. 
But as we said in that connection, there are plausible reasons 
for the exclusion, and, just as BellSouth failed in that context 
to suggest a punitive purpose, here it equally fails to suggest 
any intent to favor non-BOCs' viewpoints over BOCs'. More-
over, since intermediate scrutiny demands that the govern-
ment "not burden substantially more speech than necessary 
to further [its] interests," Turner II, 117 S. Ct at 1186, it 
would be odd to strike down a statute because Congress 
failed to restrict as much expression as it could have--
presumably because of a judgment that the interest justifying 
a restriction in one context, though "important," was slightly 


less so than in the other and therefore, at the margin, 
outweighed by competing interests (including free speech). 
See Walsh v. Brady, 927 F.2d 1229, 1238-39 (D.C. Cir. 1991) 
(Williams, J., concurring).

 Finally, we note again that s 274 leaves each RBOC free to 
publish electronically, using the facilities of its BOC subsidiar-
ies, either directly or through a subsidiary, so long as the 
acting corporation conforms to the statutory separation re-
quirements. BellSouth argues that the separated affiliate 
mechanism is entirely irrelevant to the First Amendment 
question, since "[i]t hardly answers one person's objection to 
a restriction on his speech that another person, outside his 
control, may speak for him." Arkansas Writers' Project, 481 
U.S. at 231 (internal quotations omitted). While undoubtedly 
true in the context of natural persons, this observation carries 
less weight in the context of controlled subsidiaries. The 
First Amendment does not normally permit the government 
to justify a prohibition on a corporation's speech by pointing 
to the fact that its shareholders remain free to express 
themselves without restriction; corporations exist in signifi-
cant part to overcome precisely the sorts of collective action 
problems that the shareholders in that scenario would then 
face. But there is no collective action problem here. The 
investors in BellSouth are free to use whatever portion of 
their pooled resources they wish for electronic publishing, 
subject only to the need for structural separation. This is not 
to say that structural separation requirements count as mere-
ly insubstantial burdens from a First Amendment perspec-
tive--they do not. Cf., e.g., FEC v. Massachusetts Citizens 
for Life, 479 U.S. 238, 252-54 (1986) (noting disclosure and 
record-keeping requirements entailed by corporation's use of 
segregated political contribution fund). But the fact that 
s 274 leaves RBOCs like BellSouth free to pursue electronic 
publishing strengthens our conclusion that s 274 does not 
restrict substantially more speech than necessary.

 

 * * *

 The petition for review is 

Denied.



 Sentelle, Circuit Judge, dissenting: With respect to the 
First Amendment argument of the Bell operating companies 
("BOCs"), I agree with the majority's analysis and with its 
conclusion. With respect to the bill of attainder claim, how-
ever, I agree with most of the majority's analysis; I simply 
conclude that it does not support the majority's conclusion.

 The majority opinion sets forth the provisions of 47 U.S.C. 
s 274, and I will not rehash them here, beyond a brief 
summary to set the stage for my dissent. That section 
prohibits Bell operating companies, by name, and their affili-
ates, from engaging in the provision of a lucrative line of 
business on the same terms as competitors, potential competi-
tors, or anyone else in the world. BellSouth argues that this 
provision constitutes legislative punishment for their past 
course of business conduct, and as such, runs afoul of Article 
I, section 9, clause 3 of the Constitution, which provides that, 
"No Bill of Attainder or ex post facto law shall be passed."

 As the majority notes, while the term "Bill of Attainder" 
may have originally referred to parliamentary acts sentencing 
persons to death without a trial by the judiciary, Maj. Op. at 
7, the Supreme Court early held that the prohibition extends 
to legislative punishment of specified persons beyond capital 
punishment. Fletcher v. Peck, 10 U.S. (6 Cranch) 87 (1810). 
As the majority further notes, the court has developed a 
clearly identifiable bill-of-attainder jurisprudence under which 
"legislative acts, no matter what their form, that apply either 
to named individuals or to easily ascertainable members of a 
group in such a way as to inflict punishment on them without 
a judicial trial are bills of attainder prohibited by the Consti-
tution." United States v. Lovett, 328 U.S. 303, 315-16 (1946). 
As the majority reasons, the result of this progressive revela-
tion of jurisprudence is that the prohibition against bills of 
attainder is "triggered when a legislative act meets two 
tests--first, that it apply with specificity, and second, that it 
impose punishment." Maj. Op. at 7. I completely agree. 
What I do not understand about the majority opinion is why, 


having fully loaded its analysis with specificity and punish-
ment, the majority is unable to pull the trigger in this case.

 On its face, the legislation before us appears to fall square-
ly on the condemned side of this two-part test. Section 274 
exhibits nearly unprecedented specificity, forbidding twenty 
named corporations, alone out of over 1,300 local exchange 
carriers, from entering a trade or business on the same terms 
as others. Of all the bill of attainder cases decided by the 
Supreme Court, in only one did a statute single out individu-
als by name, and that was deemed an unconstitutional bill of 
attainder. See Lovett, 328 U.S. 303. And, as the Supreme 
Court has held, "legislative bars to participation by individu-
als or groups in specific employments or professions" do 
indeed constitute punishment within the meaning of this test. 
Selective Service System v. Minnesota Public Interest Re-
search Group, 468 U.S. 841, 852 (1984). Absent the Supreme 
Court's decision in Nixon v. Administrator of General Ser-
vices, 433 U.S. 425 (1977), I think we would rule this an 
unconstitutional bill of attainder without going further.

 Mere specificity may not make an act a bill of attainder, 
but in most cases the Court has required little more. The 
Court has described the Bill of Attainder Clause as the 
embodiment of a fundamental principle of separation of pow-
ers: "a legislature can provide that persons possessing cer-
tain characteristics must abstain from certain activities, but 
must leave to other tribunals the task of deciding who pos-
sesses those characteristics." United States v. Brown, 381 
U.S. 437, 454 n.29 (1965). But Nixon precludes defining a bill 
of attainder solely in terms of its specificity. In that case, 
Congress acted against a single, named individual for disfa-
vored treatment as compared to "all other Presidents or 
members of the Government." 433 U.S. at 470. After a 
herculean struggle, the Court concluded that the statute 
could be upheld because "appellant constituted a legitimate 
class of one...." Id. at 472. The majority upholding that 
statute included Justice Stevens, who noted in his separate 
concurrence that "[t]he very specificity of the statute would 
mark it as punishment, for there is rarely any valid reason for 
such narrow legislation; and normally the Constitution re-


quires Congress to proceed by general rulemaking rather 
than by deciding individual cases." Id. at 485-86 (Stevens, J., 
concurring). Just so. And absent that Nixon decision, the 
theory advanced by Brown and echoed by Justice Stevens 
would in my view be an adequate basis for striking down the 
present legislation.

 Nixon, of course, is a unique case. It involved a disgraced 
President of the United States who had, as Justice Stevens 
pointed out, "resigned his office under unique circumstances 
and accepted a pardon for any offenses committed while in 
office," thereby "plac[ing] himself in a different class from all 
other Presidents." Id. at 486. Despite my respect for the 
Supreme Court, I must say that this case may well be 
evidence of the classic statement that hard cases make bad 
law. The majority circumvented the apparent status of the 
statute, singling out one President by name, with an uncon-
vincing analysis holding that the burden placed upon him was 
not a punishment. Chief Justice Burger's dissent, 433 U.S. at 
536-45, noted the anomalous character of the decision legiti-
mating a " 'class of one' ... under the Bill of Attainder 
Clause." Id. at 545. Without that decision, the analysis 
suggested by Justice Stevens would impel if not compel a 
decision that the statute before us runs afoul of that clause. 
The legislative imposition of a burden solely on a class of 
individuals defined by name rather than by characteristic 
(although not a class of one as in the case of Nixon) on its 
face bespeaks an intent to punish rather than to merely 
regulate. But still, the Nixon decision is a Supreme Court 
decision, and whether a good one or a bad one, it binds us. 
Because of that decision, and its convoluted analysis holding 
nonpunitive the unprecedented burdening of a "class of one," 
we must undertake a more careful analysis of "punishment" 
under the three-part test of Selective Service System, 468 
U.S. 841.

 In what appears to have been an attempt to cabin its 
reasoning in Nixon, the Court in Selective Service System 
announced a three-part test to determine whether a statute 
imposes "punishment" for purposes of the Bill of Attainder 
Clause:


 (1) whether the challenged statute falls within the histor-
 ical meaning of legislative punishment; (2) whether the 
 statute, viewed in terms of the type and severity of 
 burdens imposed, reasonably can be said to further 
 nonpunitive legislative purposes; and (3) whether the 
 legislative record evinces a congressional intent to pun-
 ish.

Id. at 852 (internal punctuation omitted). This test leads inexorably 
to a conclusion that the statute before us is a bill of attainder. 
As to the first part of the test, even the majority must 
recognize that "legislative bars to participation by individuals 
or groups in specific employments or professions," id., have 
constituted the most common sort of statutes struck down by 
the Court as unconstitutional bills of attainder. Nixon simply 
does not change this fact. The Court in Nixon distinguished 
the statute before it as nonpunitive--not only did the statute 
fail to inflict any harm previously held to be "forbidden 
deprivations," but its provision for " 'just compensation' ... 
undercut[ ] even a colorable contention that the Government 
has punitively confiscated appellant's property...." 433 U.S. 
at 475. Here, given the history of treating line-of-business 
restrictions as punishment, such an easy escape is not avail-
able.

 Under Selective Service, we probably need go no further; 
nevertheless, analysis under the additional parts of that test 
support the conclusion that this statute is unconstitutional. 
The second prong asks "whether the statute, viewed in terms 
of the type and severity of burdens imposed, reasonably can 
be said to further nonpunitive legislative purposes." 468 U.S. 
at 852 (internal punctuation omitted). In my view, it cannot. 
The majority concludes that it can, stating: "apart from its 
specific targeting aspect, we find that s 274 has the earmarks 
of a rather conventional response to commonly perceived 
risks of anticompetitive behavior." Maj. Op. at 13. While 
the latter portion of this statement may be true, I do not see 
how we can analyze the statute in terms "apart from its 
specific targeting aspect." The statute does not address the 
characteristics of local exchange carriers that create risks of 
anticompetitive behavior. If it did, it would speak of those 


characteristics, which might well be shared by, for example, 
GTE or Sprint. See Illinois Bell Tel. Co. v. FCC, 740 F.2d 
465, 476 (7th Cir. 1984) (noting that even small LECs may 
have the "ability to abuse a monopoly position"). Then, 
whether or not a particular carrier possessed the relevant 
characteristics and therefore should be restricted would be 
subject to judicial determination. By naming the companies 
rather than describing the characteristics creating the risks, 
it seems apparent that Congress aimed, not at protecting 
present and future markets from potential abuse of monopoly 
power, but at punishing those named companies' past anti-
competitive behavior. I agree with today's majority that the 
second factor "appears to be the most important of the 
three." Maj. Op. at 13. I cannot, however, agree with the 
majority that it cuts against the characterization of section 
274 as a bill of attainder.

 I further conclude that the third factor, which I deem the 
least important, also supports classifying the statute as a bill 
of attainder. That factor requires us to examine "whether 
the legislative record evinces a congressional intent to pun-
ish." Selective Service, 468 U.S. at 852 (internal punctuation 
omitted). In my view it does. As the majority notes, "scat-
tered remarks" in the legislative history "refer[ ] to anticom-
petitive abuses allegedly committed by the BOCs in the 
past...." Maj. Op. at 17. While I find the very existence of 
the scattered remarks to be indicative of the punitive intent 
behind the statute, I do not find them conclusive. We have 
noted before that "[a]t its best, legislative history is an 
undependable guide to the meaning of a statute." Gersman 
v. Group Health Ass'n, Inc., 975 F.2d 886, 890 (D.C. Cir. 
1992). I suggest that it is no more dependable in ascertain-
ing the motive behind the statute.

 More instructive on congressional motivation than the scat-
tered remarks is the timing and apparent triggering of the 
enactment. As the majority notes in its discussion of factor 
two, Congress passed section 274 after the judiciary removed 
the information services prohibition from the modified final 
judgment. Maj. Op. at 14-15. The reinstatement of that ban 


following its judicial removal to me bespeaks, indeed shouts, a 
motive on the part of the Article I branch to reimpose a 
burden on the parties before the court which the Article III 
branch found no longer appropriate. While I have no quarrel 
with the legitimacy of a congressional motive to correct what 
it sees as an improper application of legal protection against 
future conduct, when Congress defined the burdened class by 
name rather than by characteristic or future action, I can 
discern no other motive than an intent to react to (read 
"punish") the past conduct of those named persons. This, I 
suggest, violates the principle underlying Article I, section 9, 
clause 3, given short shrift by the majority.

 That is, the prohibition against bills of attainder and ex 
post facto laws is an essential part of the Constitution's 
structural separation of powers among the three branches of 
government. As the majority's analysis suggests, that clause 
was designed to prevent punishment "without the benefit of a 
judicial trial." Maj. Op. at 7. By way of comparison, in 
Plaut v. Spendthrift Farm, Inc., 514 U.S. 211 (1995), the 
Supreme Court struck down as unconstitutional a congres-
sional enactment "to the extent that it require[d] federal 
courts to reopen final judgments entered before its enact-
ment." Id. at 240. While the statute before us does not 
literally run afoul of that prohibition, it partakes of the same 
sort of violation of separation of powers safeguards. That is, 
it does not simply regulate or prohibit future conduct or 
create a ban on the entry into a line of business based on 
risks of future anticompetitive behavior, but rather, it singles 
out for such a ban, such a burden, named entities. It is one 
thing for the legislature to attempt to protect competition by 
defining a standard against which the conduct of individuals 
can be measured. It is quite another for it to simply list the 
names of individuals who Congress perceives as having un-
controllable monopolistic tendencies. This short-circuits the 
factfinding and due process protections of trial in an Article 
III court, and therefore runs afoul of the structural provisions 
embodied in the Constitution's Bill of Attainder Clause.


 I would say in closing that the majority's discussion of the 
lightness of the burden, typified by the ways in which a BOC 
might restructure in order to get around it, goes only to the 
weight of the punishment, not its character as punishment. 
Thus, that part of the majority's reasoning does nothing to 
convince me that the statute can survive constitutional scruti-
ny.